Re NPS Pharmaceuticals, Inc. Can I just ask a question about, is this, is this, is this, is this, is this, is this, I guess you're asking the Deputy Clerk to hand out to us, is this something that's in the briefs? Um, this is in the briefs. This is just a demarcation. What does that mean? Uh, this is just a summary of what we talked about. Okay. But this part was a comparison here of some of what was in the briefs before the court also. It's just in the abstract without looking at it. I thought it might be helpful to the court. If it's not helpful to the court, I don't need to use that because it was just there as an aid. Should I begin? Yeah, please. May it please the court. The 886 patent essentially claims formulations of GLP-2 are an analog, particularly Gly-2-GLP-2, histidine to stabilize the peptide, a phosphate buffer for physiological pH, and mannitol or sucrose as a bulking agent for lyophilization. The board made errors of law and errors of fact in finding the challenge claims obvious. First, the board erred in using hindsight to find the predictability required by KSR in combining Drucker with Osterberg or Kornfeld. Second, the board erred by focusing on superficial similarities between the prior arc glucagon and GLP-2, not the material differences as required by Graham v. Deere. Third, the board erred by summarily dismissing secondary considerations when the invention made GADX a viable commercial product, just as in the court's decision in Millennium v. Sandoz this past July. Each error requires reversal. The board misread Osterberg and Kornfeld and then applied its erroneous findings, readings, to find predictable obviousness. It seems to me one of the difficulties you have, so maybe you can incorporate responding to this and what you're about to tell us, but you've got a battle of the experts here, and it seems like Dr. Palmieri, which was the other side's expert, right? Yes. The board seemed to credit what he said, his observations, and his conclusions. Now, you may disagree with that, and your expert might have disagreed with that, but on a substantial evidence review here, if the board has credited what this expert has said, it's kind of hard to get by that. So can you just factor that in? I know there's stuff in the record that you can make an argument, as you did to the board, about Dr. Palmieri's conclusions, but the board chose to credit him, and it's kind of hard to get by that. Well, Dr. Palmieri's conclusions were all based upon hindsight. There's nothing in the record that he could rely on other than his own opinion that would lead one to where he went without hindsight. For example, Osterberg talks about, generally, amino acids as being general stabilizers, right? And there, from that statement alone, you can't predict which amino acid will work for any particular protein. But Osterberg is all about L-histidine. Osterberg is about L-histidine. You see, there was a sort of oversimplification of Osterberg. The reasons to pick histidine from among the other amino acids that Osterberg talks about, because Osterberg, in the first page of Osterberg, says that amino acids and or sugars are general protein stabilizers. But Osterberg stands for the proposition that you pick histidine out of the hundreds of amino acids if you need its two other properties. That's what distinguishes histidine from all the other amino acids. He doesn't say that histidine will work for any particular peptides except for metalloproteins, factors 8 and 9. But you're requiring a conclusion. I mean, there's an obvious to try, there's a whether, there's a motivation. You don't need proof here. The other site didn't need proof that it would absolutely 100% work and the result was entirely there. We're just talking about whether or not there would have been a motivation to try based on these results. Right, and what we're saying it was not predictable based upon what Osterberg told you about histidine and what Kornfeld told you about glucagon. It was not predictable that histidine would function as a stabilizer in a formulation that already had a buffer, that already had a lyophilization aid, because... Didn't Palmieri conclude otherwise? Yes, he did, and he was incorrect, and I'll explain to you why. But that gets to the substantial evidence question. No, it gets actually to the fact... I mean, you can stand up here and say that the expert is wrong, but that's not our job to make a fact finding about whether the expert was right or wrong. That's up to the board. It gets to the point that the findings that the board made were clearly erroneous based upon what the reference... That's the wrong standard. It's not clearly erroneous. It's substantial evidence. Well, there is substantial evidence going the other way. You lose. I mean, substantial evidence going the other way doesn't help you if there's substantial evidence to support what the board did. There isn't substantial evidence to support what the board did. That's the problem. Dr. Palmieri relied upon superficial similarities between glucagon and GLP-2 rather than looking at the differences. I mean, we're here as a court of review. That's the job of the board. You bring in your expert, they bring in their expert, and you each make your arguments, and the board evaluates those two and picks between them or comes up with some combination of them. But the error of law was that he did not do what Grandier said, was to look at the differences between the prior art and the present invention. What he looked at were superficial similarities. The differences are overwhelming in favor of the fact that it's not obvious. The similarities were irrelevant. They were irrelevant in fact and they were irrelevant in law under Grandier. Didn't he recognize that there were some similarities? He recognized some similarities, yes, but the similarities were irrelevant. He recognized similar name, similar family, similar number of amino acids. That's all he recognized. However, the differences that he did not recognize and didn't explore, he even testified he did not go to them, were differences in optimum pH, differences in solubility. And you had an expert that outlined that, right? Yes, absolutely, Dr. Carpenter. Dr. Carpenter outlined all those differences and he did not look at the degradation of pathways. He did not look at the dissimilarities between the two peptides, glucagon and Gly2-GLP2. The white amino acids are the dissimilarities, the differences. There are many more. He didn't look at the differences in degradation of susceptible amino acids. They're in color. There are differences in position and in place. What is it that you can point us to as evidence, something that's evidence-based that can tell us that the board was wrong here because it was quite clear to one of ordinary skill in the art at the time the invention was made that these differences, whatever differences you want to point at, would make a critical difference to a skilled artisan in choosing what kind of amino acid, what kind of excipient to add to the active ingredient in order to stabilize it for long-term storage. Quellen tells you that the most important thing to look at, the most important thing to look at for any kind of stabilization, any kind of formulation for a peptide is degradation, degradation of pathways. Dr. Palmieri testified that he never, ever, ever looked at that. It wasn't important to him. The prior art showed him that histidine would work, and therefore the patent showed that it worked, and therefore it worked. I guess the trouble I have with the case is that the board looked at Osterberg,  It was published after Cleland. And Osterberg could be read broadly as to say, you know, we all know we need to stabilize these proteins for long-term storage. And now I'm going to study L-histidine to add. And L-histidine seems to do well as a stabilizer. It also works as a buffer too. But there's advantages to using L-histidine. And it doesn't in any way say, well, don't use L-histidine for certain kinds of proteins that have certain kinds of physical characteristics, which glucagon-like protein too happens to have. But that's the concern I have is that here the board relied on a teaching from Osterberg. It seems kind of broad, the teaching, arguably. And then Kornfeld clearly teaches the use of histidine along with mannitol to stabilize glucagon. And so now we also know that there's an important goal to stabilize glucagon-like peptide too, your active ingredient. And so there is some reason to believe that you would use the histidine taught by Osterberg and also taught by Kornfeld. And this is where the board misread Osterberg. It was an oversimplification of Osterberg. The first thing Osterberg says in general, which is what you alluded to, is sugars and or amino acids are often included in formulations to prevent inactivation during freeze drying and to stabilize the protein during long-term storage. That's at appendix 247. However, histidine is one of hundreds of amino acids because even Kornfeld uses non-naturally occurring amino acids and dipeptide amino acids. So now what else does Osterberg say? Osterberg adds that histidine, histidine in particular, is useful if you need one of two other properties, each of which is irrelevant here. The two other properties that Osterberg talks about with histidine is that it may act as a buffer, that's at appendix 2247, and that it may work to stabilize metalloproteins, factors 8 and 9, by being a metal ion scavenger, and that's at appendix 2253. That's why it calls histidine multifunctional, and that's why it says histidine may be particularly good. Now, let's go back to the other priority. Drucker taught using a phosphate buffer with GLP-2, and that's exactly what the 886 patent uses. There's no need for another buffer. The histidine buffer property, there's no need for that with GLP-2. As a matter of fact, at appendix 5135 and 5137, you'll find that Dr. Carpenter testified that buffer competition would teach away from using histidine in combination with phosphate or any other buffer, because buffers can interact with one another and offset one another. Now, Drucker also taught that lyophilization of GLP-2, GLP-2, can be done without an amino acid, because Drucker taught lyophilized GLP-2 without an amino acid. So there's no need, according to Drucker, to have an amino acid in this formulation to help in lyophilization. The present formulations also do not include any metal ions, so you don't need a metal scavenger, and the present formulation is not a metalloprotein, so you don't need an amino acid that stabilizes metals. There's nothing there that says, out of all the amino acids that are often included in formulations to prevent inactivation during freeze-drying and stabilize proteins, use histidine with the kind of protein or peptide that you have GLP-2. Now let's go over to Kornfeld. Kornfeld is directed specifically to glucagon. The only reason why you would take the teachings of Kornfeld and apply them to GLP-2, or Gly-2-GLP-2, is if you found some substantial similarity, or that the differences between glucagon and GLP-2 are not significant, are not material. But that's not the case. Dr. Palmieri found simply superficial similarities. Same names. That's nonsense. Same family. So what? There are 15 other proteins in that family also. Dr. Palmieri could not testify they could stabilize... Well, I guess you're saying, why would you? I mean, another way of asking the question is, why wouldn't you? Because if you put another buffer in, right, then you have buffer competition. You may ruin the buffering capability of phosphate. And if you put an ion scavenger in there, there's a very strong statement by Dr. Carpenter that... Let me get to that in just a second. That you need to... You can't add...  There needs to be data to show that adding that excipient will aid the formulation. There was no data at all that showed that anything adding histidine would aid that formulation. There was data that showed that histidine might hurt that formulation by acting as a competing buffer. So you wouldn't go to histidine. And even if you would try, there's no expectation of success. And also, it was explained in the Carpenter article and in the Carpenter book chapter that you needed a detailed knowledge of the protein as a prerequisite to making choices for excipients. In other words, even if you had this list of excipients, and this was the greatest... Histidine was the greatest stabilizer in the world, which it isn't. It's like everything else for anything that we might use it for. So there's hundreds of them. But if you want to use it as a buffer, that's a good indication to use it. If you want to use it as a metal ion scavenger, that's a good indication to use it. But without detailed knowledge of the protein itself, which is GLP-2 here, and that was not anywhere in the prior art. That was in our patent. There was no way to tell whether a protein would cooperate. Now, as Dr. Carpenter said in his article, that it was unpredictable whether a protein would cooperate in formulation and would be illogical or would be illogical or inconsistent. That's in appendix 3176. That's the essence of unpredictability. So you have no indication to use histidine from Osterberg for GLP-2 or in its formulation, because you don't need histidine as a buffer and you don't need histidine as an ion scavenger, and you have no indication at all... You need it as a stabilizer. And it was used in Kornfeld as a stabilizer. It was used in Kornfeld as a stabilizer. But histidine is used in many formulas as a stabilizer. Why would you go from glucagon to GLP-2? There's no rational reason to go from glucagon to GLP-2 other than the fact that they have the same name and come from the same family. Now, even Dr. Palmieri, who said, oh, there's sequence similarity, he ran away from that. He disavowed that. And that's in the brief. He absolutely disavowed it. He said, I'm not relying on that. The reason why you would go is if one of Ordinary Skill and the Art were the formulation scientists and went to look at these two peptides here and said, look at the degradation pathways. They're all different. Different places, different amino acids, different similarities in sequence. Now, there's one other thing that Dr. Palmieri talked about and that was, you need to stabilize an alpha helix. An alpha helix is essential to stability. And that was his mantra all the way through. You've got to stabilize them because both glucagon, the similarity of similarity, was glucagon and GLP-2 both have an alpha helix. That is totally unsupported by the evidence. Totally unsupported. Knudsen at 21, 28, and 30 said that glucagon has structural heterogeneity in liquid or lyophilized form. No alpha helix. Knudsen said that GLP-2 is expected to be highly flexible and unstable. Blundell said that receptor-induced secondary structure is absent from a formulation. Fang said maintaining secondary structure is not a prerequisite for glucagon in stability in lyophilized form. Everything said, everything that Dr. Palmieri relied upon for similarities didn't mean a thing and he never, ever looked at inhibition pathways, which were very important. He could not show, we have to look at the differences between glucagon and GLP-2 and he never, ever said that the differences were not significant. This is just my last question. Sure. What is the evidence in the record that tells me that the degradation pathway is so critical? I understand that Dr. Carpenter says the distinction in degradation pathways is critical to choosing what stabilizer to pick, but what else besides him saying it? Cleland. Cleland at 31, 18. Cleland says degradation pathways are extremely important. That's known. Can I say one other thing before we leave? Secondary considerations, real quickly. The secondary considerations here, the board disregarded secondary considerations because the board did not give any credit to the fact that there was a long felt need or that there was commercial success. However, the millennium case that this court decided in July clearly shows that it's right on point in that this was disinvention. The 886 patent made GADX a commercially viable product. It was not viable alone. The active alone was not a viable product. Lyophilization alone was not a product. The commercialization, the commercial success and the long felt need are attributable to the formulation. And the board completely disregarded that. Thank you. Thank you. We have your argument. The case is submitted. Thank you.